# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF PENNSYLVANIA

| MESLISSA MARIE GRAHAM, | ) | |
| --- | --- | --- |
| | ) | Civil Action No. 12-1857 |
| | ) | |
| Plaintiff, | ) | Judge Joy Flowers Conti |
| | ) | Magistrate Judge Cynthia Reed Eddy |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVILLE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

Acting pursuant to 42 U.S.C. § 405(g), Melissa Graham ("Graham" or "the Claimant") appeals from a November 16, 2012 final decision of the Acting Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income benefits under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1318-1383. Cross-motions for summary judgment are pending. The Court recommends that the Motion filed by the Commissioner (ECF No. 11) be granted and that the Motion filed by the Claimant (ECF No. 9) be denied.

### II.   REPORT

Background

On July 20, 2009, the Claimant filed an application for supplemental security income benefits, alleging an onset date of September 1, 2008. (ECF No. 6-2 at p. 1). The claim was denied initially on October 14, 2009. (Id.). On December 1, 2009, Graham requested a hearing

which took place on March 1, 2011 before an Administrative Law Judge ("ALJ") in Seven Fields, Pennsylvania. (Id. at p. 28). Graham, who was represented by counsel, her husband, her grandmother, and a vocational expert testified. (Id.). At the time of the hearing, Graham, who was born on May 3, 1988, was twenty-two years old, and had earned a GED. (Id. at pp. 33, 35). She had not engaged in prior relevant work meeting the definition of substantial gainful activity. (Id. at p. 38). [1] When asked what prevented her from working, Graham stated, "I have really bad back pain that goes into my like left hip, into my leg. I have a hard time bending for a long period of time. I can't stand for a long time. I start getting pains really bad. And walking long, I can't walk long. It hurts." (Id. at p. 39). The muscle relaxant she tried not to taken too often made her drowsy and dizzy. (Id. at p. 41) The Claimant stated that her primary medical care was overseen by a nurse practitioner at "the Community Health Clinic." (Id.). She did not go there often, except to pick up medicine. (Id.) Clinic personnel advised that it would be beneficial for

---

[1] 20 C.F.R. § 404.1572 defines what the Social Security Administration means by the term "substantial gainful activity":

> Substantial gainful activity is work activity that is both substantial and gainful:
>
> (a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.
>
> (b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.
>
> (c) Some other activities. Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.

her to receive steroid shots from a pain clinic, but she did not have insurance coverage that would permit her do so. (Id. at p. 42). To cope with her pain, she used a heating pad or sat in a recliner. (Id.). She stated that if she failed to lie down, she would "be in so much pain, [she would] probably start crying because it hurts so bad." (Id.). The pain began after the birth of her son, and worsened after a fall in 2008. (Id. at pp. 53-54). Brief testimony given by Graham's husband and grandmother confirmed Claimant's account of her pain-related limitations. (Id. at pp. 55-58).

Graham also testified that she had suffered with asthma her whole life. "It seems like it's very under control right now, my asthma. The only time I would wheeze would probably be if I'm walking far or trying to do something at home like housework. I'll start wheezing and then I'll have to take my emergency inhaler." (Id. at p. 39). Graham stated that she thought that the wheezing associated with housework was due to exertion and exposure to cleaning products and dust that caused her to sneeze, and then wheeze. (Id.).

The Claimant also alleged that a learning disability interfered "[a] little bit' with her ability to work." (Id.). She experienced difficulty counting change and required her husband's help with money at the store. She also had trouble measuring. She testified that beyond back pain, asthma, and the learning disorder, she had no other disabling conditions. (Id. at p. 40).

When asked to describe her daily activities, she stated that she typically arose between 10:30 and 11:00 a.m., did a little housework, and then rested for ten or fifteen minutes. Then she would try to do dishes. Sometimes she would try to cook lunch with her husband's help, play with her four year old son without lifting him, and then sit in the recliner and watch television. (Id. at p. 43). She estimated that, in total, she spent an hour or two a day cleaning, but interspersed this activity with sitting. (Id. at p. 53). When asked whether she thought her back

3

would hurt too much if she didn't spend as much time on the recliner, she said, "I'm not sure. It's just so relaxing to me sitting on the recliner. I'm not sure." (Id. at pp. 50-51).

Graham stated that she liked to shop, but could not walk far. She could use a computer, occasionally eat out, and take her son to the movie, but sometimes had to stand up while watching. (Id. at pp. 43-44). She was able to push a grocery cart without too many items in it, and enjoyed reading young adult fiction, and, sometimes, a newspaper. (Id. at pp. 45-46). She could sit or stand comfortably for about twenty minutes, and was capable of lifting about five pounds. (Id. at pp. 46-47). Graham testified that she got along with others, and had no problems with memory or concentration. (Id. at pp. 47-48).

The vocational expert took the stand and was asked by the ALJ to assume an individual who was twenty-two with a GED, but functioning at a fifth grade level in reading and math. She was limited to lifting twenty pounds occasionally, ten pounds frequently. She could stand and walk for one hour at a time, but for as such as six hours during an eight hour workday. Pushing and pulling were limited to twenty pounds. The woman would not be permitted to climb ladders, ropes, or scaffolds, but could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. For two-thirds of the workday, she needed to avoid exposure to temperature extremes, wetness, and humidity, and respiratory irritants such as fumes, odors, dust, gas, and other similar conditions. Last, she would be limited to simple tasks, decisions, and instructions. (Id. at p. 60).

In response to this hypothetical, the vocational expert opined that such an individual would be able to perform unskilled light exertional level jobs available in the national and local economies. Examples included a routing clerk, a finish inspector, and an office helper. (Id. at p. 61). In response to a second hypothetical, the expert opined that a person having the limitations to which Graham testified would be unable to work. (Id. at pp. 60-61). When questioned by

4

Graham's attorney, the expert clarified that in order to perform the jobs identified, a person falling within the parameters of the ALJ's hypothetical required a low reasoning ability in the grade four to six range. (Id. at p. 63).

Graham's attorney then argued that in light of IQ testing appearing in the record along with Graham's significant back impairment, she was disabled as she met one of the listings set out at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at p. 64).

In a decision dated March 15, 2011, the ALJ issued a decision finding that Claimant was not entitled to supplemental security income benefits. (ECF No. 6-2 at p. 13). On November 16, 2012, the Appeals Council denied Graham's request for review, making the ALJ's opinion the final decision of the Commissioner. (Id. at p. 2). This timely appeal followed.

**Standard of Review**

The Act limits judicial review of the Commissioner's final benefits decision to two issues: whether the factual findings are supported by substantial evidence, Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988), and whether the correct law was applied. Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984). "Where the ALJ's findings of fact are supported by substantial evidence, [the Court is] bound by those findings, even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).

**The ALJ's Decision**

In his decision, the ALJ applied the sequential five-step analysis articulated at 20 C.F.R. § 404.1520.[2] At the first step, the ALJ found that Graham had not engaged in substantial gainful

---

[2] The familiar five steps are as follows: (1) If the claimant is performing substantial gainful work, she is not disabled; (2) If the claimant is not performing substantial gainful work, her impairment(s) must be "severe" before she can be found to be disabled; (3) If the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment (or impairments) meets or medically equals a listed impairment contained in

5

employment after the date of her application for benefits. (ECF No. 6-2 at p. 15). At step two, he concluded that Graham suffered from severe impairments including borderline mental ability, asthma, scoliosis, and chronic sacrolilitis, also known as inflammation of the left sacroiliac joint. (Id.).

The ALJ then moved to step three in order to assess whether Graham's impairments met or equaled one of those listed in 20 CFR Part 404, Subpart P, and Appendix 1, particularly Listing 12.05C addressing mental retardation. (Id. at pp. 16-18). If a claimant meets the burden of showing the existence of an impairment set out in a listing, or from a combination of impairments medically equivalent to a Listing, no further analysis is required; disability is presumed, and the claimant is entitled to benefits. 20 C.F.R. 1520(d). "It is the claimant's burden to show that she meets or medically equals impairment in the Listings. Evans v. Sec'y of Health & Human Servs., 820 F.2d 161, 164 (6th Cir. 1987). The ALJ concluded that Graham had failed to make the required showing, and moved to Step Four.

There, he assessed Graham's residual functional capacity ("RFC") as follows:

> [C]laimant has the residual functional capacity to perform a range of light work as defined in 20 C.F.R. 416.967(b). She is limited to lifting a maximum of 20 pounds occasionally and 10 pounds frequently; pushing and pulling is limited to 30 pounds; standing or walking is limited to one hour at a time but up to six total hours in a work day; sitting is limited to six hours; she is unable to climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs; she can occasionally balance, stoop kneel, crouch, and crawl; she needs to avoid concentrated exposure (meaning more than 2/3 of the workday to extremes in temperature, wetness, and

---

Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry; (4) If the claimant's impairment (or impairments) does not prevent her from doing her past relevant work, she is not disabled; (5) Even if the claimant's impairment (or impairments) prevent her from performing her past work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

humidity; she needs to avoid even moderate exposure (meaning more than 1/3 of the workday) to respiratory irritants (such as fumes, dust, gasses, etc.); and she is limited to simple tasks, decisions, and instructions . . . .

(Id. at p. 18). In formulating this assessment, the ALJ considered Graham's medically determinable symptoms, and made a credibility finding regarding Graham's statements, "based upon consideration of the entire case record." (Id. at p. 19). He found that Graham's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (Id. at p. 21).

The ALJ concluded that, although Graham had held part-time jobs, for purposes of the Act, she had no past relevant work. Based on the testimony of the vocational expert, however, he concluded that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there [were jobs existing] in significant numbers in the national economy" that she could perform. (Id. at p. 23). The ALJ found, therefore, that Graham was not entitled to supplemental income security benefits. (Id. at p. 24).

**Allegations of Error**

The ALJ's Failure to Find Graham Disabled Pursuant to Listing 12.05C

Listing 12.05C deals with mental retardation. It is comprised of an introductory paragraph and specific criteria contained in a separate paragraph, C. The Listing's introduction reads:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports the onset of the impairment before age 22.

7

Paragraph C requires that a claimant also show "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." In order to satisfy the requirements of Listing 12.05C, a claimant must show, at a minimum, that she meets the dual requirements of the paragraph C *and* that portion of the introductory paragraph showing that her mental impairment was manifest before age twenty-two. Markle v. Barnhart, 324 F.3d 182,187 (3d Cir. 2003) (delineating this three-prong test). A conflict exists within this District regarding whether a claimant must satisfy a fourth prong – produce evidence of "deficits in adaptive functioning" within the developmental period.³ Because the Court finds that substantial evidence supports the ALJ's conclusion that the IQ score on which Graham relies does not satisfy the second prong of the 12.05C listing, it need not address whether there is a fourth.

---

³ Decisions in which courts have held that this fourth requirement must be satisfied include: Logan v. Astrue, No. 07-cv-1472, 2008 WL 4279820 at *8 (W.D. Pa. Sept. 16, 2008) (relying on Soc. Sec. Acquiescence Rul. 03-1(7) and unpublished cases decided by the United States Court of Appeals for the Third Circuit in concluding that claimant must show "deficits in adaptive functioning in order to meet Listing 12.05C.). See also Lansdowne v. Astrue, No. 11-cv-487, 2012 WL 4969363 at *4 (W.D. Pa. Sept. 17, 2012) (observing that "the requirement that plaintiff must meet the introductory criteria to § 12.05 clearly and unequivocally is stated in the explanatory notes to the mental disorder listings"); Grunden v. Astrue, No. 10-cv-569, 2011 WL 4565502 at *4 (W.D. Pa. Sept. 29, 2011) (holding that "adaptive deficits" requirement of introductory paragraph must be satisfied). These decisions cite one or more non-precedential opinions of the United States Court of Appeals for the Third Circuit. See Cortes v. Comm'r of Soc. Sec., No. 06-3562, 2007 WL 4183076) (3d Cir. Nov. 28, 2007) (stating that in order to fall within parameters of Listing 12.05C, claimant must demonstrate subaverage general intellectual functioning with deficits in adaptive functioning); Stremba v. Barnhart, No. 05-1916, 2006 WL 467966 (3d Cir. Feb. 28, 2006) (same); Gist v. Barnhart, No. 2-3691, 2003 WL 1924698 (3d Cir. April 23, 2003) (same). Other courts have relied on the Court of Appeals' precedential opinion in Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003) for the proposition that claimants need *not* show deficits in adaptive functioning. See, e.g., Schmidt v. Comm'r of Soc. Sec., No 2:09-cv-707, 2009 WL 5206019 at *9 (W.D. Pa. Dec. 23, 2009); Brown v. Comm'r of Soc. Sec., No. 08-cv-1265, 2009 WL 3087220 at *11 (W.D. Pa. Sept. 23, 2009); Jackson v. Astrue, No. 08-cv-1407 (W.D. Pa. July 2, 2009); Manigault v. Astrue, No. 08-cv-1409 at *7 (W.D. Pa. April 30, 2009); Mallough v. Astrue, Civil Action No. 08-cv-957 (W.D. Pa. April 9, 2009); Velardo v. Astrue, No. 07-cv-1604, 2009 WL 229777 at *5 (W.D. Pa. Jan. 29, 2009).

It is undisputed that the Listing at 12.05C requires that Graham "establish a valid verbal, performance, or full scale IQ score of sixty through seventy and a physical or other mental impairment imposing an additional and significant work-related limitation of function." She must also show that her mental deficit was "initially manifested during the developmental period," i.e., before age twenty-two.

Although an IQ in the stated range is necessary to a finding that Listing 12.05 is met, satisfying that requirement is not necessarily dispositive. "While a valid IQ score below seventy will satisfy the first prong of the listing requirement, it is entirely appropriate for an ALJ to examine evidence other than IQ tests to determine whether a claimant is mentally retarded." Carter v. Astrue, No. 3:08-CV-37, at *2 (M.D. Ga. Aug. 26, 2009) (citing Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992)) (stating that a valid IQ score need not be conclusive of mental retardation where the score is inconsistent with other evidence). IQ scores are not diagnoses, impairments, or functional limitations, and they should not be used as such. "While the ALJ may reject an IQ score, he is required to review all of the pertinent evidence of record and explain his 'conciliations and rejections.'" Schmidt, 2009 WL 5206019 at *9 (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000)). See Velardo, 2009 WL 229777 at *8 (citing Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998)) (ALJ did not err in rejecting IQ score where claimant was literate, completed ninth grade in regular classes, held a job, and was the primary caretaker of her child).

Here, the issue is whether substantial evidence exits to support the ALJ's determination that the results of Graham's IQ test failed to satisfy the 12.05C requirement for a finding of mental retardation. Evaluating the record against the background of that Listing, the ALJ recognized that Graham received a Verbal Intelligence Score of 69 on the Wechsler Adult

9

Intelligence Scale Test administered by Psychologist, Clarence Anderson, in 2009, before she reached the age of twenty-two. The Section 12.05C Listing unambiguously states that the IQ requirement is met when the plaintiff has any valid IQ score below 70. See Halstead v. Shalala, 862 F. Supp. 86, 90 (W.D. Pa. 1994). Nonetheless, the ALJ found that the "mental retardation" requirement had not been met "because the record shows higher functioning." (ECF 6-2 at p. 16). He based this finding, first, on high school records showing Graham's eligibility for special education that included ninety minutes per day of special education math and English classes. She demonstrated satisfactory progress in her classes and earned fair grades. Though she withdrew from formal education following tenth grade, she was, "although it took some effort," able to obtain a GED. (Id.). The ALJ then noted, "As WAIS test scores have a potential five-point range either up or down (a 69 score shows potential functioning from 64 to 74), the interpretation of the score is dependent on the mental health professional administering the test." (Id.).

The narrative portion of Anderson's report showed that Graham had a driver's license, and that her chief complaint was a back problem. (ECF No. 6-10 at p. 10). Her hygiene and grooming were above average. She was "very cooperative, attentive and gave full effort. There was [no] evidence of coaching and she related and interacted with this examiner acceptably well. Melissa smiled and initiated conversation. All speech was intelligible. She did not wear corrective lenses and her hearing was intact." (Id.). Graham told Anderson that she was "able to shop and cook independently. It is felt she can do some cleaning house maintenance with her back impairment. She has skills to pay bills and could use public transportation. Her impairment has not affected her self-care skills, or hygiene. In fact, these are her strengths." (Id.). Anderson also wrote that Graham "gets along with family, friends and neighbors. She also got along with

those individuals with whom she worked when she was employed. Thus she does not have any people problems and enjoys friendships." (Id.). "[H]er concentration and persistence were at least average. She worked at an average pace." (Id.)

Anderson concluded, however, that Graham's "overall thinking and reasoning ability [were] in the "Borderline Range of Cognitive Ability." (Id. at p. 11). She could read and write and perform math at a fifth grade level. (Id. at p. 12). Anderson diagnosed Graham with "Borderline Mental Ability." (Id. at p. 15). [4]

With respect to work-related mental activities, Anderson concluded that Graham had no restrictions in understanding and remembering or carrying out short simple instructions, interacting appropriately with the public, supervisors or co-workers, and only slight restrictions in understanding, remembering and carrying out detailed instructions, making judgments on simple work-related decisions, and responding appropriately to changes [or] pressures in a usual or routine work setting. (Id. at p. 14).

The ALJ found that "[a] number of other factors confirm that the claimant has been functioning in the 'borderline range.'" (Id.). He wrote:

> Largely consistent with the opinion of [Dr.] Anderson is the mental assessment by non-examining state consultant Edward Zuckerman, Ph.D. Although he noted [Graham's] diagnosis of borderline intellectual functioning, he assessed her as capable of making simple decisions and carrying out short and simple instructions.

(Id. at p. 22). The ALJ also found support for the conclusion that Claimant was functioning in the "borderline range" in the fact that she had worked part-time, most recently with the Butler County Association for the Blind in 2010, transporting patients to appointments. This "require[d]

---

[4] Claimant points out that Dr. Anderson used the phrase "borderline mental ability" rather than borderline intellectual function, but the Court fails to find and Claimant does not draw any meaningful or relevant distinction between these terms.

11

an ability to follow directions and adhere to a structured schedule. The claimant stated that she left the job due to her physical condition and gave no indication that she was unable to perform her work due to mental limitations." (Id. at p. 17). She gave essentially the same testimony regarding her inability to perform a full range of housework, including caring for her young son. Though she stated that it was difficult for her to count money, she elsewhere indicated that she was able to pay her own bills and handle a checking account. (Id.). "Although [she] stated that she is not able to finish what she starts, she reported that she is able to pay attention 'for a long time' and that she is good at following instructions." (Id.).

Based on this evidence, the ALJ concluded that Graham's mental impairments did not meet or equal Listing 12.05C. The Court finds that this conclusion is supported by substantial evidence.

The Failure to Credit Treating Source's Opinion Regarding Graham's Physical Impairments

Graham next challenges the ALJ's failure to accord significant weight to the opinions of her treating medical provider, registered nurse practitioner, Dana Haas. In June 2009, Haas completed Pennsylvania Department of Public Welfare Medical Assessment and Physical/Mental Examination Forms (ECF No. 6-9 at pp. 38, 48) indicating that Graham had limited employability. In Haas's opinion, Graham could work only thirty hours per week at light duty, could lift, push, or pull no more than five pounds, and stand no longer than several hours without resting.[5] (Id. at pp. 39, 48). Haas indicated that Graham would be re-evaluated on December 10. 2009. (Id.). Only a single examination is documented in the medical records. Then, Graham's primary diagnosis was described "chronic lower back pain (Asymmetrical sacroiliitis – left)." (Id. at p. 40). Her secondary diagnosis was "asthma." (Id.). The ALJ declined

---
[5] On the second assessment form, Haas indicated that Graham could sit or stand no more than one hour at a time. (ECF 6-9 at p. 48).

to give Haas's opinion great weight, finding that her assessment was "not consistent with the claimant's reported activities of daily living . . . [Graham's] reported activities show a higher functional ability . . . The objective testing showed only relatively minor back problems and there is no indication that nonconservative treatment of the claimant's back was ever recommended." (ECF No. 6-2 at p. 21). In September 2009, Graham herself indicated in a Disability Function Report that she "[could] only lift like *twenty pounds*." (ECF No. 6-6 at p .21) (emphasis added).

Under controlling law and regulations a treating medical provider's opinion regarding a claimant's ability to work is not entitled to special deference. See Rose v. Astrue, No. 12-cv-82E, 2013 WL 3421983 at *8 (W.D. Pa. July 8, 2013) (citing 20 C.F.R. §416.927(d)).[6] "The ALJ - not treating or examining physicians of State agency consultants - must make the ultimate disability

---

[6] This regulation provides:

(d) Medical source opinions on issues reserved to the Commissioner. Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

(1) Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity (see §§ 416.945 and 416.946), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). "The law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Id. (quoting Brown v. Astrue, 649 F.3d 193, 197 n. 2 (3d Cir. 2011). The Court finds that Claimant's argument based on the ALJ's failure to credit Haas's evaluation of Claimant's ability to function lacks merit.

Alleged Error in the Determination of Claimant's Residual Functional Capacity

After examining the evidence set out in the record, the ALJ determined that Graham had the RFC to perform simple, unskilled, light work. In arguing that the ALJ's determination is not supported by substantial evidence, Claimant recasts her argument regarding the weight given to Haas's functional capacity findings and forecasts her argument that the ALJ failed to find Graham's complaints of pain fully credible.

> In both of [Haas's reports] . . . , limitations are indicated which the residual functional capacity determination of the Administrative Law Judge clearly exceeds. Specifically, her healthcare provider indicated that she can life a maximum of five pounds that that she would need rest periods for her back. Further, during the hearing before the Administrative Law Judge, [Graham], her husband and her grandmother all testified that she needs to recline in order to alleviate her severe back pain.

(ECF No. 10 at p. 18). The Court finds merit in neither of these arguments. As the Court has already explained, the ALJ was under no obligation to adopt the limitations formulated by Haas, and adequately articulated the grounds for his decision not to do so.

The Claimant does not challenge the RFC insofar as it addresses her mental impairment, but focuses instead on the incompatibility of the physical demands of the RFC with limitations imposed by her physical conditions. The ALJ found that Graham's medically determinable impairments could reasonably be expected to produce pain, challenges with certain personal care activities, and exacerbation of her asthma with exposure to dust and physical exertion. (ECF No.

6-2 at p. 19). He also noted that she had claimed to be able to lift twenty pounds, but had significant difficulty squatting, bending standing, reaching, and kneeling. "Additionally, she alleged that she was able to sit for less than an hour at a time and walk for less than a mile before needing to rest." (Id.).

The ALJ also found, however, that the Graham's statements concerning "the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent" with the RFC determination. (Id.). For example, the ALJ's assessment that Graham could lift twenty pounds was consistent with her own statement. She also described activities of daily living that were "broad and independent," such as shopping using a computer, eating out, going to the movie, doing light cleaning and laundry, and caring for her son, with the exception of being able to lift or carry him. (Id.).

The ALJ also noted that medical records documenting Claimant's back impairment and asthma were spare, failing to support her claim that she was unable to work "within the parameters of the residual functional capacity assessment." (Id. at p. 20). Graham contends that her back pain began shortly after the birth of her child in 2006. There is no indication in the record that she sought or received treatment for that pain until it was exacerbated by a fall in September 2008. At that time, Graham visited the Emergency Room at Butler Memorial Hospital, complaining of lower back and leg pain associated with a fall. She described suffering from chronic leg pain. Her back was tender. (ECF No. 6-9 at p. 16). X-rays were taken of her lumbosacral spine, her left hip, and her left knee. The report of the lumbosacral spine X-ray reads: "There is good anatomic alignment of the lumbosacral vertebrae with maintenance of the vertebral and disc heights. The pars interarticularis of L5, bilaterally, are not well seen.

Spondylolysis cannot be entirely excluded." (Id. at p. 19).[7] Hip and knee films were negative. (Id. at pp. 21, 23). Graham was given Naproxen and twelve Vicodin to be taken at home, and was discharged the same day, with a diagnosis of lumbosacral strain. (Id. at pp. 26, 28).

Additional diagnostic studies were performed at Butler Memorial in late September 2008. A September 24, 2008 MRI of the lumbar spine did not show disc herniation or stenosis at any level. There was no evidence of a spinal mass, neural foramina were patent, and the interverterbral discs had normal height and signal pattern. There was mild left rotatory scoliosis, and a low signal of the left sacroiliac joint was seen on primary axial T2 images. Plain sacroiliac joint films were recommended. (Id. at p. 33). These films, taken on October 13, 2008, showed scleroses involving the left SI joint on the ilial aspect. There was no evidence of erosions, and the sacral ala were intact. (Id. at p.32).

Graham visited the Butler County Community Health Clinic for the first time on September 24, 2008. The entry pertaining to examination of her extremities reads "slightly [sic] atrophy? [left] calf?" (Id. at p. 44). There are no additional records of examinations conducted at the Clinic, although records show that she kept appointments there on October 8, 2008 for an unspecified reason, on January 5, 2009 complaining of a tooth abscess, on May 12, 2009 for exacerbation of her asthma and back pain, and on September 8, 2009 for eczema and diarrhea. (Id. at p. 36). She was seen in the Butler County Memorial Hospital Emergency Room on

---

[7] Spondylolysis is a defect in the connection between vertebrae that can lead to small stress fractures. It is a common cause of low back pain in children and the most likely cause of low back pain in people younger than twenty-six. It is more common in children and teens participating in sports that place stress on the lower back or cause constant overuse. Initial treatment is always conservative, directed at pain reduction to permit the fracture to heal. Over the counter steroids may be prescribed. If steroids do not provide relief, stronger medicines may be necessary. A program of exercise or physical therapy is recommended. See http://my.clevelandclinic.org/disorders/Back_Pain/hic_Spondylolysis.aspx

September 15, 2010 for gastroenteritis. (Id). The record does not reveal additional examination of Graham's back by any medical source.

The treatments prescribed by Graham's treatment professional were conservative, consisting of "short bursts" of Naproxen, warm compresses, and activity breaks. (Id. at pp. 49-50). There is no indication that she requested or received stronger medication, or that she was referred to or seen by a specialist. Physical therapy and steroid injections from a pain clinic would have been prescribed, but Graham lacked insurance to cover these services. The ALJ assessed Graham's overall credibility as follows:

> [H]er allegations of impairments so severe that she is precluded from all employment are not supported by her treatment records. Although the record contains some objective findings of problems involving her spine and sacroiliac joints, the objective finding have been minimal and her treatment sparse, consisting only of pain medication and heat applications. The physical therapy and steroid injections recommended by the claimant's primary care physician are also conservative in nature. There is no indication that surgery or other aggressive treatment has been considered. It is also noted that the claimant alleged that her back pain started after the birth of her child, although the medical evidence fails to establish any trauma. The claimant's asthma is well controlled. Both the examining psychologist, Dr. Anderson, and the state consultant, Dr. Zuckerman assess the claimant as being capable of sustaining work in spite of her mental impairment. The claimant's activities of daily living and social functioning also demonstrate that [she] is able to function successfully in her personal life and are not consistent with the allegation that her impairments are so severe that she is unable to sustain any employment. The claimant's sparse work history, even given her age, also does little to enhance her credibility.

(ECF No. 6-2 at p.22) (internal citations omitted).

It is the ALJ's role to determine credibility. See Breslin v. Comm'r of Soc. Sec., No. 12-cv-2385, 2013 WL 93159 at *3 n.7 (3d Cir. Jan. 9, 2013) (citing SSR 96-7p). The Court finds that the credibility determination in this case rested on substantial evidence.

Questions Posed to and the ALJ's Reliance on the Opinion of the Vocational Expert

It was the ALJ's findings with respect to the objective evidence and his well-supported credibility determination that informed the hypothetical questions posed to the vocational expert. The ALJ was not obligated to rely on the vocational expert's answer to a question that included limitations not documented in the record. See Swagger v. Astrue, No. 10-779, 2011 WL 578760 at * 19 (W.D. Pa. Feb. 9, 2011) (quoting Johnson v. Comm'r of Soc. Sec., 529 F.3d 198 (3d Cir. 2008)) ("[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant."). While an ALJ must consider subjective testimony regarding a claimant's pain, he is not, as Graham argues, required to rely on the vocational expert's testimony that no jobs would accommodate her limitations had all of her testimony been credited. Walton v. Comm'r of Soc. Sec., No. 01-2135, 2003 WL 1875559 at *8 (6th Cir. April 11, 2003).

The ALJ posed a hypothetical that included impairments supported by objective medical evidence, and took into account his well-founded credibility determination. The expert's testimony that jobs accommodating these impairments were available in the national economy constituted substantial evidence that the Claimant was capable of substantial gainful employment, and was not, therefore, disabled within the meaning of the Social Security Act.

### III.  CONCLUSION

The Court finds Claimant's allegations of error on the part of the Commissioner to be

18

without merit. Thus, it is recommended that the Motion for Summary Judgment filed by the Commissioner (ECF No.11) be granted, and that the Motion for Summary Judgment filed by the Claimant (ECF No. 9) be denied.

In accordance with the Magistrate's Act, 28 U.S.C. § 636 (b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, objections to this Report and Recommendation must be filed by August 15, 2013. Failure to file timely objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011). Any response to objections is due no later than August 25, 2013.

August 1, 2013

Respectfully submitted,

Cynthia Reed Eddy
United States Magistrate Judge

cc: Counsel of Record via CM-ECF