# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MELISSA MARIE GRAHAM, | )<br>) Civil Action No. 12-1857<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| CAROLYN W. COLVIN,<br>Acting Commissioner of<br>Social Security Administration, | )<br>)<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION

CONTI, District Judge.

### *Introduction*

Melissa Marie Graham ("Graham" or "Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security ("Commissioner" or "Defendant") denying her claim for supplemental security income benefits under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1318-1383. Graham and the Commissioner filed cross-motions for summary judgment (ECF Nos. 9, 11). These motions were referred to a magistrate judge who filed a Report and Recommendation (ECF No. 13), recommending that the court grant the motion filed by Defendant and deny the motion filed by Plaintiff. Plaintiff filed objections (ECF No. 14), contending, among other things, that the magistrate judge erred in finding that substantial evidence supported the Commissioner's conclusion that Plaintiff failed to meet the Listing at 20 C.F.R. pt. 404, subpt. P, app.1 § 12.05C (the "12.05C Listing"). Despite the court's order to do so, the Commissioner failed to respond to these objections. (ECF Order dated August

20, 2013). After de novo review of the entire record in this matter, together with the Report and Recommendation, and the objections thereto, the court declines to adopt the magistrate judge's Report and Recommendation, finding that application of the law to these facts established that Plaintiff meets the requirements of the 12.05C Listing, and is entitled to supplemental security income benefits. Accordingly, summary judgment will be granted in Plaintiff's favor, reversing the underlying decision of the administrative law judge (the "ALJ"). The case will be remanded for the calculation and award of benefits.

*Procedural History and Factual Background*

On July 20, 2009, the Graham filed an application for supplemental security income benefits, alleging an onset date of September 1, 2008. (ECF No. 6-2 at 13). The claim was denied initially on October 14, 2009. (Id.). On December 1, 2009, Graham, who was then twenty-one years old, requested a hearing which took place on March 1, 2011, before the ALJ in Seven Fields, Pennsylvania. (Id. at 28). Graham, her husband, her grandmother, and a vocational expert testified. (Id. 29-30). At the time of the hearing, Graham, who was represented by counsel, was twenty-two years old, and had earned a GED. (Id. at 30, 33, 35). She had not engaged in prior relevant work meeting the definition of substantial gainful activity. (Id. at 37).[1] When asked what

---

[1] 20 C.F.R. § 404.1572 defines what the Social Security Administration means by the term "substantial gainful activity":

> Substantial gainful activity is work activity that is both substantial and gainful:
>
> (a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

2

prevented her from working, Graham stated, "I have really bad back pain that goes into my like left hip, into my leg. I have a hard time bending for a long period of time. I can't stand for a long time. I start getting pains really bad. And walking long, I can't walk long. It hurts." (Id. at 38). Graham also testified that she suffered from asthma and that a learning disability interfered "[a] little bit" with her ability to work. (Id. at 39).

Asked to describe her daily activities, Graham stated that she was able to alternate light housework with rest. Sometimes she would try to cook lunch with her husband's help, play with her four-year-old son, although she could not lift him, and then sit in a recliner and watch television. (Id. at 43). Graham stated that she liked to shop, but could not walk far. She could use a computer, occasionally eat out, and take her son to the movie, sometimes having to stand while watching. (Id. at 43-44). She was able to push a grocery cart without too many items in it. (Id. at 45). She enjoyed reading young adult fiction, and, sometimes, a newspaper. (Id. at 46). She could sit or stand comfortably for about twenty minutes, and was capable of lifting about five pounds. (Id. at 46-47). Graham testified that she got along with others, and had no problems with memory or concentration. (Id. at 48).

A psychologist, Clarence Anderson ("Anderson"), evaluated Graham on October 1, 2009. (ECF No. 6-10 at 9). Graham, who was born on May 3, 1988, was twenty-one years old at the time of the evaluation. (Id.). Anderson found Graham had a valid verbal IQ score of 69, a

---

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

(c) Some other activities. Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.

performance IQ score of 79 and a full scale IQ score of 72. (ECF No. 6-10 at 11). The psychologist noted that IQ scores in the 70-79 range are borderline. (Id.).

On March 15, 2011, the ALJ issued a decision finding that Graham was not entitled to supplemental security income benefits. (ECF No. 6-2 at 10). On November 16, 2012, the Appeals Council denied her request for review, making the ALJ's opinion the final decision of the Commissioner. (Id. at 2).

In his decision, the ALJ applied the sequential five-step analysis articulated at 20 C.F.R. § 404.1520.[2] At the first step, the ALJ found that Graham had not engaged in substantial gainful employment after the date of her application for benefits. (ECF No. 6-2 at 15). At step two, he concluded that Graham suffered from severe impairments including borderline mental ability, asthma, scoliosis, and chronic sacroliitis, or inflammation of the left sacroiliac joint. (Id.).

At step three, the ALJ assessed whether Graham's impairments met or equaled the 12.05C Listing addressing mental retardation, found at 20 C.F.R. part 404, subpart P, and Appendix 1. (Id. at 16-18). If a claimant establishes the existence of a listed impairment, or a combination of impairments medically equivalent to a Listing, no further analysis is required; disability is presumed, and benefits are awarded. 20 C.F.R. 1520(d). It is the claimant's burden

---

[2] The familiar five steps are as follows: (1) If the claimant is performing substantial gainful work, she is not disabled; (2) If the claimant is not performing substantial gainful work, her impairment(s) must be "severe" before she can be found to be disabled; (3) If the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry; (4) If the claimant's impairment (or impairments) does not prevent her from doing her past relevant work, she is not disabled; (5) Even if the claimant's impairment (or impairments) prevent her from performing her past work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

to show that she meets or medically equals an impairment in the Listings. Evans v. Sec'y of Health & Human Servs., 820 F.2d 161, 164 (6th Cir. 1987). The ALJ concluded, among other things, that Graham failed to establish a disability within the meaning of the 12.05C Listing and she has the residual functional capacity to perform other work which exists in significant numbers in the national economy (ECF No. 6-2 at 23-24). This timely appeal followed.

*Legal Standard*

A claimant requesting benefits under the Act is entitled to judicial review of the Commissioner's denial. 42 U.S.C. §405(g). The court will affirm the Commissioner's adoption of an administrative law judge's finding if it is supported by substantial evidence. Id.; Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 1971)). Under this standard, a court is not permitted to weigh the evidence or substitute its own conclusion for that of the fact-finder. Id.; Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless whether the court would have differently decided the factual inquiry).

A district court's review of a magistrate judge's report and recommendation with respect to a summary judgment motion is de novo. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(B)(3).

*Discussion*

This appeal turns on whether the ALJ's failure to apply the 12.05C Listing, dealing with mental retardation, was supported by substantial evidence. The 12.05C Listing comprises an

introductory paragraph and specific criteria set out in separate paragraphs. The introduction reads:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports the onset of the impairment before age 22.
>
> <u>The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.</u>

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05 (emphasis added).

Paragraph C, which is implicated in this case, requires that a claimant show "[a] valid verbal, performance, <u>or</u> full scale IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing an additional and significant work-related limitation of function." <u>Id.</u> at 12.05C (emphasis added). In order to satisfy the [three] requirements of the 12.05C Listing, a claimant must show that she meets the dual requirements of Paragraph C *and* that portion of the introductory paragraph showing that her mental impairment was manifest before age twenty-two. <u>Markle v. Barnhart,</u> 324 F.3d 182, 187 (3d Cir. 2003) (delineating this three-prong test).

The ALJ recognized that Graham had a valid score of 69 on the Verbal Intelligence portion of the Wechsler Adult Intelligence Scale ("WAIS") Test administered by a psychologist, Anderson, before reaching the age of twenty-two. He also noted Graham had severe physical impairments, i.e., asthma, scoliosis and chronic sacroliitis. Nonetheless, the ALJ found that the "mental retardation" aspect of the 12.05C Listing was not met "because the record shows higher functioning." (ECF No. 6-2 at 16). He based this finding first, on high school records showing Graham's eligibility for special education that included ninety minutes per day of remedial math and English classes. She demonstrated satisfactory progress in her classes and earned fair grades. Although she withdrew from formal education following tenth grade, she was later able to obtain

6

a GED. (Id.). The ALJ noted, "[a]s WAIS test scores have a potential five-point range either up or down (a 69 score shows potential functioning from 64 to 74), the interpretation of the score is dependent on the . . . professional administering the test." (Id.). The margin of error associated with IQ tests, however, is not to be taken into account in determining whether a Listing applies. See, e.g., Burns v. Barnhart, 312 F.3d 113, 125 (3d Cir. 2002) (held that if an error range of five points were read into the regulation, "it would violate the plain language of the regulation, which requires '[a] valid verbal, performance, or full scale IQ of 60 through 70.' 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 12.05."); Elder v. Commissioner, Civil Action No. 07-59, 2008 WL 2993501, at *1 (W.D. Pa. July 31, 2008) (noted decisions rejecting "applying margin of error in IQ test scores to determine whether the requirements of the 12.05C Listing are met."); Williams v. Apfel, No. 99-039, 2000 WL 376390, at *12 (D. Del. Mar. 30, 2000) ( holding plaintiff not entitled to application of margin of error and failing to suggest that different rule should apply to Commissioner).

Anderson's narrative report showed that Graham's primary complaint was back pain. (ECF No. 6-10 at 10). With respect to her mental evaluation, "[t]here was [no] evidence of coaching, and she related and interacted with this examiner acceptably well. . . . smil[ing] and initiat[ing] conversation. [Her] speech was intelligible. She did not wear corrective lenses and her hearing was intact." (Id.). Graham told Anderson that she was "able to shop and cook independently. [S]he [could] do some cleaning house maintenance with her back impairment. She has skills to pay bills and could use public transportation. Her impairment has not affected her self-care skills, or hygiene." (Id.). Anderson also wrote that Graham "gets along with family, friends and neighbors. She also got along with those individuals with whom she worked when she was employed. Thus she does not have any people problems and enjoys friendships." (Id.).

"[H]er concentration and persistence were at least average." (Id.). Anderson stated that Graham "gave full effort" on the tests with "no evidence of coaching." (Id. at 12). He also wrote, "[i]t is felt that the results of this evaluation provide a valid measure of the claimant's intellectual ability." (Id.) (emphasis added).

Anderson found that the test results were valid and concluded that Graham's "overall thinking and reasoning ability [were] in the Borderline Range of Cognitive Ability." (Id. at 11). He supported this diagnosis with findings that Graham was not restricted in understanding, remembering or carrying out short simple instructions, and interacting appropriately with the public, supervisors or co-workers. (Id. at 14). She was slightly restricted in understanding, remembering and carrying out detailed instructions, making judgments on simple work-related decisions, and responding appropriately to changes or pressures in a usual or routine work setting. (Id.).

In finding that the 12.05C Listing (mental retardation) was inapplicable, the ALJ relied on Anderson's report noting Anderson "assessed the test scores as valid" and "[a] number of other factors confirm[ing] that the claimant has been functioning in the 'borderline' range." (ECF No. 6-2 at 16). The ALJ stated:

> Largely consistent with the opinion of [Dr.] Anderson is the mental assessment by non-examining state consultant Edward Zuckerman, Ph.D. . . . Although he noted [Graham's] diagnosis of borderline intellectual functioning, he assessed her as capable of making simple decisions and carrying out short and simple instructions.

(Id. at 22). Dr. Zuckerman, too, diagnosed Graham with "borderline intellectual functioning," but did not reference her IQ tests. (Id.).

Aside from the medical reports, the ALJ also found support for placing Graham's ability to function in the "borderline range." He considered the fact that Graham had worked part-time,

most recently with the Butler County Association for the Blind in 2010, transporting patients to appointments. This work would "require an ability to follow directions and adhere to a structured schedule . . . . The claimant stated that she left the job due to her physical condition and gave no indication that she was unable to perform her work due to mental limitations. . . ." (Id. at 17). She gave essentially the same testimony regarding her inability to perform a full range of housework, including caring for her young son. Although she testified that it was difficult for her to count money, she elsewhere indicated that she was able to pay her own bills and handle a checking account. (Id. at 17). Graham reported that "she is not able to finish what she starts," but stated that "she is able to pay attention 'for a long time' and that she is good at following instructions." (Id.). Based on this summary of the evidence, the ALJ concluded that Graham's verbal IQ score of 69 - though valid technically within the parameters of the 12.05C Listing - did not meet or equal it.

Although an IQ score within range of the 12.05C Listing is necessary to satisfy the Listing, it is not necessarily sufficient. "While a valid IQ score below seventy will satisfy the first prong of the listing requirement, it is entirely appropriate for an ALJ to examine evidence other than IQ test scores to determine whether a claimant is mentally retarded." Carter v. Astrue, No. 3:08-CV-37, 2009 WL 2750987, at *2 (M.D. Ga. Aug. 26, 2009) (citing Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992)) (stating that a valid IQ score need not be conclusive of mental retardation where the score is inconsistent with other evidence). If the IQ score of 70 or below, however, is valid, an administrative law judge cannot reject the score without a contrary medical opinion. Markel 324 F.3d at 182 (where examining psychologist found that a full scale IQ score of 70 was valid, the administrative law judge could not reject it without pointing to contrary medical opinion); Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000) (holding that the

9

administrative law judge "cannot reject IQ scores based on personal observations of the claimant and speculative inferences drawn from the record"; where no objective medical evidence discredited the validity of IQ scores, the IQ scores should have been fully considered).

In Elder v. Commissioner of Social Security, Civil Action No. 07-59, 2008 WL 2993501 (W.D. Pa. 2008), this court was guided by the principles in Markle and Morales in assessing an administrative law judge's right to reject IQ scores when determining applicability of the 12.05C Listing:

> [In Markle], [t]he court of appeals found that the administrative law judge erred in **rejecting** the IQ score. The court of appeals acknowledged that an administrative law judge may reject scores that are inconsistent with the record, but the record must "provide a basis for the rejection." . . . The court of appeals concluded that there was no basis for the rejection where the doctor who administered the test "concluded that the scores he reported were valid, as he did not qualify them or find that they were inconsistent with the various positive aspects he noted in [the plaintiff's] appearance, demeanor and conduct." . . . The administrative law judge did not have an "expert opinion of a psychologist or medical person to contradict [the doctor's] IQ finding." . . . The court also noted that "'a[n] ALJ cannot reject IQ scores based on personal observations of the claimant and speculative inferences drawn from the record.'" . . . The court of appeals recognized that activities such as having a driver's license, work history as a truck driver, limited literacy, and doing laundry were "not inconsistent with qualifying mental retardation."

Elder, 2008 WL 2993501, at *6 (internal citations omitted)(emphasis in original). "While the ALJ may reject an IQ score, he is required to review all of the pertinent evidence of record and explain his 'conciliations and rejections.'" Schmidt v. Comm'r of Soc. Sec., No. 2:09-cv-707, 2009 WL 5206019, at *9 (W.D. Pa. Dec. 23, 2009) (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000)).

In Harrison v. Astrue, Civil Action No. 07-1136, 2008 WL 4133085 (W.D. Pa. Aug. 29, 2008), this court considered Markle and commented:

> In Markle, the administrative law judge rejected the claimant's IQ score and determined that the claimant, Markle, did not meet the requirements of the 12.05C Listing. Markle, 324 F.3d at 184-85. Markle's IQ test revealed a full scale IQ score of 70 and other scores higher than 70. Id. at 183. The administrative law judge found that Markle's physical condition constituted an additional severe impairment and met the requirement of the second prong of the three-prong test of 12.05C Listing. Id. at 187-88. The administrative law judge, however, rejected the full scale IQ test score based on Markle's behavior and activities and found that Markle did not establish that he had a valid IQ score of 70 or lower, the first prong of the three-prong test. Id. at 184. The court of appeals concluded that the administrative law judge erred when he failed to credit Markle's full scale IQ score of 70. Id. at 183. The court pointed out that because the administrative law judge concluded that Markle did not meet the 12.05C Listing due to Markle's failure to established [sic] the IQ score requirement for 12.05C Listing, he did not inquire into the third requirement for the impairment, which is reflected in the introductory paragraph of the 12.05C Listing, "namely, whether Markle's mental retardation was initially manifested during his development period" or "before age 22." Id. at 188. The court remanded the case to the administrative law judge so that he could develop the record further and determine whether Markle met "the third element of a [12.05C Listing] impairment, namely whether his retardation commenced before age 22." Id. at 189. It was clear that if Markle's retardation began before age twenty-two, he would satisfy the 12.05C Listing. There was no requirement that a claimant show "deficits in adaptive functioning" as a separate requirement; otherwise, there would be a fourth prong to the test.

Id. at *7.

Applying these principles to the facts of this case, the court concludes that the ALJ erred in finding that Graham failed to satisfy the 12.05C Listing. As the court of appeals illustrated in Markle, which involved a claimant who had a full scale IQ score of 70 – meaning that claimant would have been diagnosed like Graham as borderline, decisions in which courts have relied on factors other than qualifying IQ scores to conclude that the 12.05C Listing has not been met are readily distinguishable from Graham's situation. For example, the United States Court of Appeals for the Eighth Circuit held that an administrative law judge "properly rejected the validity of the claimant's performance IQ of 66 and full scale IQ of 67 where she had worked in the private sector, had a driver's license and was the primary caretaker of her young daughter

11

and had completed ninth grade without special education services." Markle, 324 F.3d at 187 (citing Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998)). In Clark, the IQ tests were conducted when the claimant was twenty-nine and "[n]othing in her extensive medical records indicates that she was ever suspected of being mildly mentally retarded prior to [her evaluation]." Clark, 741 F.3d at 1256. The court in Markle also noted that a different claimant with a qualifying IQ did not meet the 12.05C Listing, because she had earned a two-year college degree, enrolled in a third year of college, and had been employed as an algebra teacher at a private school. Id. at 188 (citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)). The claimants in Clark and Popp demonstrated an ability to function that exceeded Graham's abilities.

Given Anderson's explicit validation of Graham's IQ scores and Graham's less than expansive activities of daily living, the court does not find substantial evidence in the record upon which the ALJ could properly have relied to exclude Plaintiff from the application of the 12.05C Listing. In particular the ALJ erred in relying on a margin of error to reflect a verbal IQ score higher than 69. In reaching this conclusion, the court recognizes that there are a few district court decisions which conclude that there is an inherent inconsistency in crediting an IQ score included in the 12.05C Listing while, at the same time, diagnosing the claimant with borderline intellectual functioning. See, e.g., Van Armburgh v. Colvin, Civil Action No. 12-96J, 2013 WL 5463774, at *3 (W.D. Pa. Sept. 30, 2013) ( finding that diagnosing claimant with borderline intellectual functioning rather than mild mental retardation where the range of IQ falls within the 12.05C Listing range implicitly invalidates scores) (citing Manigault v. Astrue, Civil Action No. 08-1409, 2009 WL 1181253, at *9 (W.D. Pa. Apr. 30, 2009)) (holding that where trained psychologist diagnoses claimant with borderline intellectual functioning despite test

results reflecting mild mental retardation "he implicitly found the scores invalid"). Those decisions, however, do not address the court of appeals' decision in Markle in which the requirements of the 12.05C Listing were met with respect to an IQ score of 70, which is borderline. Markle and the plain language of the 12.05C Listing do not support the ALJ's analysis and rejection of a valid IQ score.

To the extent that these decisions hold that the diagnosis -- rather than the IQ score -- is controlling, the court disagrees, and reiterates its prior holding:

> Plaintiff's diagnosis . . . is not the issue. The 12.05C Listing does not contemplate a diagnosis as one of the requirements. The 12.05C Listing clearly states that the IQ requirement is met when the plaintiff has any valid IQ score below 70. 20 C.F.R. pt. 404, subpt. P, app.1 §12.05C; see Halsted v. Shalala, 862 F. Supp. 86, 90 (W.D. Pa. 1994) (recognize[ing] that lowest IQ score must be used in applying the 12.05 Listing). The ALJ determined that plaintiff did not meet the 12.05C Listing because plaintiff did "not function as a retarded person." . . . Contrary to the ALJ's legal analysis in this case, the appropriate issue should have been whether plaintiff's IQ test scores below 70 were valid and not whether she functions as a retarded person. An administrative law judge may reject an IQ score, but there must be substantial evidence of record to support a finding that the score was invalid.

Elder, 2008 WL 2993501, at *5 (citing Markle, 324 F.3d at 187) (some citations omitted).

## *Conclusion*

In this case where plaintiff – prior to reaching the age of twenty-two – had a valid IQ score below 70 and suffered from severe impairments including "asthma, scoliosis, and chronic sacroiliitis" (ECF No. 6-2 at 15), she met the requirements of 12.05C Listing. For the reasons set forth above, the court declines to adopt the magistrate judge's Report and Recommendation. Summary judgment will be granted in favor of Graham and against the Commissioner. An appropriate order follows.

January 16, 2014

                                        <u>/s/ JOY FLOWERS CONTI</u>
                                        Joy Flowers Conti
                                        Chief United States District Judge